**BACKENROTH FRANKEL & KRINSKY, LLP**
489 5th Avenue
New York, New York 10017
(212) 593-1100
Counsel to the Debtors


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| 553 West 174th St LLC, | Case No. 11-14968 |
| Debtor. | |

----------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| SE Opportunity Fund LP, | Case No. 11-14970 |
| Debtor. | |

----------------------------------------------------------x

## <u>JOINT DISCLOSURE STATEMENT</u>

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CREDITORS AND PARTIES IN INTEREST OF 553 WEST 174TH ST LLC AND SE OPPORTUNITY FUND LP ("DEBTORS"). THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT CREDITORS' DECISIONS TO ACCEPT OR REJECT THE DEBTORS' PLAN OF REORGANIZATION. ALL CREDITORS ARE URGED TO READ THIS DISCLOSURE STATEMENT. ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS CONTAINED IN THE PLAN OF REORGANIZATION ANNEXED TO THE DISCLOSURE STATEMENT AS EXHIBIT A.**

**THESE CASES HAVE NOT BEEN SUBSTANTIVELY CONSOLIDATED AND THE PLAN IS COMPRISED OF TWO PLANS; I.E., SEPARATE PLANS FOR EACH DEBTOR. CONFIRMATION OF EACH PLAN IS CONTINGENT UPON CONFIRMATION OF BOTH PLANS.**

**COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE COURT APPROVAL OF THE TERMS OF THE PLAN.**

## INTRODUCTION

1.       553 West 174th St LLC ("553 West") and SE Opportunity Fund LP ("SE" collectively with 553 West, the "Debtors") submit this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of their Joint Plan of Reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is attached hereto as Exhibit "A."  All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement  All capitalized terms used but not defined shall have the meaning set forth in the Plan.

2.       This Disclosure Statement is not intended to replace a review and analysis of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the Plan.  To the extent a Creditor has any questions, the Debtors urge you to contact the Debtors' counsel and every effort will be made to assist you.

3.       THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.  THE DEBTORS' GOAL IS FOR ALL CREDITOR CLASSES TO ACCEPT THE PLAN.  IF ALL CREDITOR CLASSES DO NOT ACCEPT THE PLAN, THE DEBTORS MAY SEEK TO CONFIRM THE PLAN OVER THE REJECTION OF ANY CLASS UNDER SECTION

1129(b) OF THE BANKRUPTCY CODE AS MAY BE NECESSARY TO EFFECT

CONFIRMATION OF THE PLAN.

4.	On _____, 2011, after notice and a hearing, the

Bankruptcy Court entered an order approving this Disclosure Statement as containing

information of a kind and in sufficient detail in light of the nature and history of the Debtors and

the condition of the Debtors' books and records, to enable Creditors whose votes are being

solicited to make an informed judgment whether to accept or reject the Plan.

5.	Creditors should read this Disclosure Statement in its entirety prior to

voting on the Plan. No solicitation of votes may be made except pursuant to this Disclosure

Statement.

6.	THE INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT HAS BEEN SUPPLIED BY THE DEBTORS. THE DEBTORS' BOOKS AND

RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE

DEBTORS' FINANCIAL CONDITION AS SET FORTH IN THE DISCLOSURE

STATEMENT. BASED UPON THE INFORMATION MADE AVAILABLE, DEBTORS'

COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION

DISCLOSED HEREIN IS INACCURATE. NEITHER THE DEBTORS NOR DEBTORS'

COUNSEL, HOWEVER, IS ABLE TO STATE DEFINITIVELY THAT THERE IS NO

INACCURACY HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE

INFORMATION CONTAINED HEREIN INACCURATE.


7.      After reviewing this Disclosure Statement, indicate your vote to accept or

to reject the Plan on the enclosed ballot, and return the ballot to: Backenroth Frankel & Krinsky,

LLP, 489 Fifth Avenue, New York, New York 10017, on or before

_____, 2011.  LATE BALLOTS WILL NOT BE COUNTED.


8.      The Bankruptcy Court has entered an Order fixing

_____, 2011, at _____ a.m., at the United States Bankruptcy Court,

One Bowling Green, New York, New York as the date, time and place for the hearing on

confirmation of the Plan and fixing _____, 2011, as the last date for the

filing of any objections to confirmation of the Plan.


## GENERAL INFORMATION REGARDING THE DEBTORS


9.      On October 26, 2011, the Debtors each filed a Chapter 11 petition under

Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").


10.      SE owns 100% of the membership interest in 553 West.  553 West owns

the real property known as 120 West 74th Street, New York, New York (the "Property"). The

Property is a vacant 5 story walk-up apartment building, with 10 residential units.

11.     The Debtors estimate that the Property has a $5,500,000 value.  This value is based upon purchase offers for the property.

12.     Walter Tillow (the "Lender" or the "Mortgagee") asserts a first mortgage claim in the amount of approximately $2,475,000.

13.     SE's general unsecured claims total approximately $1,409,000, which includes a $1,382,500 claim in favor of its general partner White Oak Profit Sharing Plan ("White Oak").  553 West's general unsecured claims total approximately $1,182,630, including a $140,000 of claim in favor of White Oak and a $1,005,000 claim in favor of SE.

14.     This case was filed to facilitate the sale of the Property.  As described below, the Property is tied up in state court litigation and the Debtors can no longer afford to carry the Property pending the outcome of that litigation.

15.     By way of background, 553 West entered into a contract (the "Contract") dated April 20, 2010 to purchase the Property from Walter Tillow.  Paragraph 23 of the Rider to the Contract provided that "the Closing shall take place at the offices of the Seller's counsel at 10:00 a.m. on November 1, 2010, or such other earlier date or such other place as the parties may agree upon."  Nothing in the Contract permitted 553 West to unilaterally adjourn the closing. Accordingly, the closing was required to take place on November 1, 2010 in order to avoid the

consequences of a default and the loss of the down payment made in connection with the Contract.

16.     The Contract also provided that 553 West had the option of taking a purchase money mortgage from the Seller in the amount of $2,500,000.00.  This was a very valuable right.

17.     Between the time 553 West entered to the Contract with the Seller, and the deadline to close, 553 West retained a broker to market the Property so that 553 West could "flip" it at closing.  In early September, 2010, the broker advised 553 West that Bryan Binder was interested in purchasing the Property.

18.     Binder wanted to take advantage of the purchase money mortgage offered by the Seller.  In order to protect that option, 553 West agreed with Binder that Binder and SE would enter into a Joint Venture Agreement which would allow 553 West, as purchaser, to close under the Contract, and simultaneously allow Binder to purchase one hundred (100%) percent of the interests of 553 West from SE Opportunity, on condition that Binder fund the balance of the cash due under the terms of the Contract at Closing and the balance of the amount due to the Debtors.

19.     Binder and his counsel were put on due notice that the Closing on the Contract would take place on November 1, 2010 at 10:30 a.m. at the 0ffices of Seymour Hurwitz,

the Seller's attorney, and that Binder would be required to fund all cash necessary to close the transaction on that date, time and place.

20.     In a number of email exchanges, Binder's attorney indicated that Binder would be unable to close at the scheduled closing on Monday, November 1, 2010 10:30 a.m. Accordingly, the Debtors' beneficial owners liquidated certain investments to have the cash necessary for 553 West to close the transaction .

21.     Mr. Lazar, Mr. Binder's attorney, appeared at the closing at Mr. Hurwitz' office on November 1, 2010 at approximately 10:00 a.m. without Mr. Binder.  He was advised by one of the seller's attorneys, Mark Abrams, Esq., and by 553 West, that the closing would be taking place later that morning. Mr. Lazar did not indicate that Binder was ready to close and did not indicate why he had appeared without his client.

22.     Thereafter, Mr. Lazar apparently returned to Mr. Hurwitz' office at approximately 2:30 p.m., again without his client.  At that time, 553 West was in the middle of closing on the purchase, since Binder had not appeared with the required cash.  Once again, Mr. Lazar did not state why he had returned to Mr. Hurwitz' office at 2:30 p.m. without Binder. Certainly, he did not come to close the transaction.

23.     The closing concluded at approximately 3:00 p.m.  After 553 West left Mr. Hurwitz' office, 553 West was advised by Mr. Hurwitz that Mr. Lazar and another member

of his firm, Gary Moss, Esq., came to Mr. Hurwitz' office at 4:30 p.m.  By that time, however, under the terms of the Joint Venture Agreement, Binder was in default of his obligations.  Binder no longer had any right to close.

24.     Binder refuses to accept the fact that he missed the deadline to close and thereby lost the deal.

25.     Indeed, Binder filed a false and baseless complaint with the New York County District Attorneys' office claiming that Seth Miller, one of the beneficial owners of the Debtors, somehow "conspired" to "steal" Binder's money.  This baseless and scurrilous claim was made even though all funds paid by Binder have at all times remained in escrow with Debtors' counsel subject to any order of the Supreme Court or the Bankruptcy Court.  Mr. Miller provided the District Attorney with all of the relevant documents and emails. To date, the District Attorney has taken no steps with regard to Binder's reckless complaint and none is expected.

26.     More importantly with respect to these cases, Binder filed a complaint in the Supreme Court of New York County.  Shortly after the commencement of that action, Binder made an application by order to show cause seeking an injunction preventing and enjoining the Debtors from "selling, assigning, transferring, encumbering, mortgaging or hypothecating any interest in the [Property]."  With the Debtor's consent, on December 8, 2010, the Supreme Court granted the Order to Show Cause.  By subsequent order dated January 25, 2011, the Court amended its December 8, 2010 Order by modifying the language therein to read: "selling,

assigning, transferring, encumbering, leasing, or mortgaging and hypothecating any interest" in the Property.

27.     The Debtors consented to the Order to Show Cause in anticipation of speedy trial of the issues.  Having effectively frozen the Debtors, however, it is now ten months later, and Binder refuses to conduct discovery in good faith and has ignored his obligation to respond to the Debtors' discovery demands.  This, notwithstanding the fact that the Debtors complied with Binder's discovery demands as of March 2011.

28.     In the meantime, the Debtors are incurring approximately $40,000.00 per month in carrying charges, but remain effectively prohibited by order of the Supreme Court from utilizing the Property in a manner that generates any income.  In addition, Binder has encumbered the Property with a lis pendens.

29.     Mr. Miller is a real estate broker with 30 years' experience and he has been marketing the Property in order to stop the drain on the Debtors' resources, and by extension, the owner's equity in the Property.  Towards that end, he has located a prospective buyer that has agreed to act as a stalking horse for a sale in the Bankruptcy Court, for an all-cash $5,500,000 purchase price that the Debtors believe is fair in this market.

30.     The Debtors' Plan, therefore, seeks approval of the sale of the Property, subject to higher and better offers, with all liens claims and encumbrances to attach to the

proceeds of sale.  In this way, the Property can be sold, creditors paid, and the excess sale

proceeds, if any, can be escrowed.  Binder can continue to litigate over who is entitled to the sale

proceeds without holding the Property hostage and without causing the Debtor to generate large

monthly losses.  Similarly, by virtue of Binder's breach of contract and his post-closing conduct,

SE believes that it has claims against Binder for his $700,000 deposit and a $1,000,000 claim for

malicious prosecution, all of which can be resolved post-confirmation.


### THE DEBTORS' PLAN OF REORGANIZATION
### CLASSIFICATION AND TREATMENT OF CLAIMS


### 553 West Class 1: New York City Lien Charges


31.  **Classification** – Real estate tax, water, sewer and other lien charges held

by the City of New York which constitute first liens on the Property.  The Debtor estimates that

$44,240 is due.


32.  **Treatment** – Payment in full in cash plus interest at the Statutory Rate on

the Effective Date.


33.  **Voting** – Unimpaired and deemed to have accepted the Plan.

**553 West Class 2: Walter Tillow**

34.     **Classification** – First mortgage on the Property.  Claim totals approximately $2,475,000 as of the Petition Date.

35.     **Treatment** – Payment in full in cash plus interest at the contract rate on the Effective Date.

36.     **Voting** – Unimpaired and deemed to have accepted the Plan.

**553 West Class 3: Priority Claims**

37.     **Classification** – Claims under Sections 507(a)(2), (3), (4), (5), (6), (7) and (8) of the Bankruptcy Code.  The Debtor is aware of no such Claims.

38.     **Treatment** – Payment in full in cash plus interest at the Statutory Rate on the Effective Date.

39.     **Voting** – Unimpaired and deemed to have accepted the Plan.

**<u>553 West Class 4: General Unsecured Creditors</u>**

40.     **<u>Classification</u>** – Allowed Unsecured Claims.  Such Claims  total approximately $1,182,630.

41.     **<u>Treatment</u>** – On the Effective Date, each Claimant shall be paid its pro-rata share of the funds available after payment of administration claims and Classes 1 through Class 3 Claims, up to Allowed Amount of its Claim, plus interest from the Petition Date at the Legal Rate.

42.     **<u>Voting</u>** – Impaired and entitled to vote accept or reject the Plan.

**<u>553 West Class 5: Equity Interests</u>**

43.     **<u>Classification</u>** – SE, 553 West's Interest Holder.

44.     **<u>Treatment</u>** – Payment of the funds available after payment of administration claims and Classes 1 through Class 4 Claims on the Effective Date.

45.     **<u>Voting</u>** – Impaired and entitled to vote accept or reject the Plan.

## SE Class 1: Priority Claims

46. **Classification** – Allowed Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), (7) and (8) of the Bankruptcy Code. The Debtor is aware of no such Claims.

47. **Treatment** – Payment in full in cash on the Effective Date with interest at the statutory rate.

48. **Voting** – Unimpaired and deemed to have accepted the Plan.

## SE Class 2: General Unsecured Claims

49. **Classification** – Allowed Unsecured Claims. Such Claims total approximately $1,409,000.

50. **Treatment** – On the Effective Date, each Claimant shall be paid its pro-rata share of SE's available funds available after payment of administration claims and Class 1 Claims, up to Allowed Amount of its Claim, plus interest from the Petition Date at the Legal Rate.

51. **Voting** – Impaired and entitled to vote accept or reject the Plan.

**SE Class 3: Equity Interests**

52. **Classification** – Interest Holders.

53. **Treatment** – Payment of the funds available after payment of administration claims and Classes 1 and Class 2 Claims on the Effective Date.

54. **Voting** – Impaired and entitled to vote accept or reject the Plan.

**ADMINISTRATIVE EXPENSES AND U.S. TRUSTEE FEES**

55. Allowed Administrative Expenses shall be paid in full in Cash on the Effective Date, or the date such Administrative Expense becomes Allowed, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtors shall be Paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction. Any outstanding U.S. Trustee fees shall be paid in full in Cash on the Effective Date.

56.     Backenroth Frankel & Krinsky LLP, as counsel for the Debtors, received a $20,000 retainer from 553 West and a $5,000 retainer from SE. Backenroth Frankel & Krinsky, LLP anticipates that total fees for these cases will exceed that amount in the event that confirmation of the Plan necessitates litigation.

57.     United States Trustee fees will be paid, and operating reports will be filed as they come due by the Debtors.

## MEANS FOR IMPLEMENTATION OF THE PLAN

58.     Property Transfer - Effective Date Plan payments, including payment of administration claims, shall be made from the proceeds of sale of the Property. The Debtor shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan, including, without limitation, selling the Property substantially on the terms and conditions of the contract annexed to the Plan as Exhibit A, subject to higher and better offers pursuant to the sale procedures, as annexed to the Plan as Exhibit B.

59.     Sale Approval -- As part of the sale under the Plan, and in order to ensure consummation of the Plan, the Plan requires that the Confirmation Order contain the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c)

that the transfer of the Property to the purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

60.     Break-Up Fees/Bid Protections – As provided in the contract (Exhibit A to the Plan) of 553 West to sell the Property to Adam Berkowitz, Mr. Berkowitz shall have be entitled to a "break-up" fee as the "stalking horse" bidder pursuant to the sale procedures for the Property.  The break-up fee (the "Break-Up Fee") shall be $100,000 and shall be paid only if (a) 553 West fails to consummate the sale to Mr. Berkowtiz as a result of the Debtor's acceptance of a competing offer and closing on a sale pursuant to that competing offer or (b) Mr. Berkowitz becomes the purchaser at a price higher than $5,500,000.  No Break-Up Fee shall be payable if Mr. Berkowitz is in breach of his obligations under his contract with 553 West (Exhibit A to the Plan). The Break-Up Fee shall be paid solely from the proceeds of the competing offer over and above the contract price, and Mr. Berkowitz shall have no other recourse against the Debtors for the Break-Up Fee.  The minimum first competing offer at the Auction shall be an amount that is not less than $50,000 over the contract price set forth in Exhibit A to the Plan.

61. Release of Liens -- In order to facilitate the sale to the Purchaser free and clear of all liens claims and encumbrances, on the Effective Date, except as otherwise provided in the Plan, and/or the Confirmation Order, and concurrent with payment on the Effective Date, the Plan provides that each holder of a Secured Claim, shall on the Effective Date (a) turn over and release to the Reorganized Debtor any and all Collateral that secures or purportedly secures such Claim, as it pertains to the property owned by the Debtor or such Lien shall automatically, and without further action by the Debtor or the Reorganized Debtor, be deemed released, and (b) execute such documents and instruments as the Reorganized Debtor requests to evidence such Claim holder's release of such property or Lien.

62. Transfer Tax -- Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document

recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer

tax, or other similar tax or governmental assessment including without limitation New York City

Real Property Transfer Tax and New York State Documentary Tax.

63. Vesting of Assets -- Except as otherwise provided in the Plan, on the

Effective Date all assets and properties of the Estate shall vest in the Debtor free and clear of all

commercial leases Liens, Claims and encumbrances and any and all liens, claims and

encumbrances that have not been expressly preserved under the Plan shall be deemed

extinguished as of such date. Except as otherwise provided herein, as of the Effective Date, all

property of the Debtor shall be free and clear of all Claims and Interests of Creditors, except for

the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

64. Execution of Documents -- The Debtor shall be authorized to execute, in

the name of any necessary party, any notice of satisfaction, release or discharge of any Lien,

Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all

federal, state and local governmental agencies or departments for filing and recordation.

65. Recording Documents -- Each and every federal, state and local

governmental agency or department shall be authorized to accept and record any and all

documents and instruments necessary, useful or appropriate to effectuate, implement and

consummate the transaction contemplated by the Plan, including, but not limited to any and all

notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly

preserved by the Plan, and the Confirmation Order.

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

66.     All unexpired leases and executory contracts not rejected prior to the

Effective Date shall be assumed under the Plan.  The Debtors are unaware of any executory

contracts or leases.  To the extent, however, that the Bankruptcy Court may find that the contract

with Bryan Binder is an executory contract between either or both of the Debtors, then such

contract shall be deemed rejected under the Plan.

67.     Claims Upon Rejection.  In the event of a rejection of any Executory

Contract which results in damage to the other party or parties to the Executory Contract, a Proof

of Claim for such damages must be filed by the damaged party with the Court within sixty (60)

days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory

Contract shall be treated as an Unsecured Claim.

68.     Failure to File.  Any Claim arising from the rejection of any Executory

Contract not filed with the Court within the time period provided in the preceding paragraph

above shall be deemed discharged and shall not be entitled to participate in any distribution under

the Plan.

## FINANCIAL INFORMATION AND LIQUIDATION ANALYSIS

69.     Annexed hereto as Exhibit B are the Debtors' balance sheets and liquidation analyses.

70.     The Debtors assume that in a liquidation, the Debtors' assets would exceed their liabilities, but that depending upon the amount of Allowed general unsecured claims, after payment Chapter 7 liquidation expenses, general unsecured creditors may not be paid in full, as proposed under the Plan.

## PREFERENCE AND FRAUDULENT CONVEYANCE ANALYSIS

71.     The right to pursue preference, fraudulent conveyances or other types of claims under 11 U S.C. §544(b), 547, 548, 549, and 550 or applicable state law will survive the Plan, and the Debtors shall have the exclusive right to prosecute such claims.

72.     The Debtors believe that there are no such claims.

## OBJECTIONS TO CLAIMS

73.     The Debtors reserve their rights to file objections to Claims in the event grounds exist to object to particular Claims.  Such objections will be filed no later than 120 days

after the Effective Date.  In the event that objections to claims are filed, the amount of

distributions that may have to be made on such claims shall be segregated by the Debtors until

the resolution of such objections.


## MANAGEMENT OF THE DEBTORS


74.     The Debtors are managed currently by Jennifer Miller and Seth Miller, and

management will remain unchanged under the Plan.


## TAX CONSEQUENCES


75.     The Debtors do not believe that there will be any negative tax

consequences to the Debtors or to Creditors under the Plan.  Plan payments may constitute

taxable income.


76.     THE DEBTORS DO NOT PURPORT, THROUGH THIS DISCLOSURE

STATEMENT, TO ADVISE THE CREDITORS OR INTEREST HOLDERS REGARDING

THE TAX CONSEQUENCES OF THE TREATMENT OF THE CREDITORS AND

INTEREST HOLDERS UNDER THE PLAN.  CREDITORS AND INTEREST HOLDERS

SHOULD SEEK INDEPENDENT COUNSEL CONCERNING THE TAX CONSEQUENCES

OF THEIR TREATMENT UNDER THE PLAN.

# VOTING

77.　　A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement.  Each Creditor is entitled to execute the ballot, and return it to the undersigned to be considered for voting purposes.  The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than _____, 2011, at the following address:

Backenroth Frankel & Krinsky, LLP
489 Fifth Avenue
New York, New York 10017

78.　　Each Creditor of the Debtors whose Claim is impaired[1] under the plan is entitled to vote, if either (I) its Claim has been scheduled by the Debtors, or (ii) it has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for such filing.  Simply stated, a Creditor is impaired if it is being paid less than it is owed.

---

[1]　**Definition of Impairment**.  Under Section 1124 of the Bankruptcy Code, a class of claims or equity interests is impaired under a plan unless, With respect to each claim or equity interests of such class, the plan:

　　**a.**　　leaves unaltered the legal equitable, and contractual rights of the holder of such claim or interest; or

　　**b.**　　notwithstanding any contractual provision or applicable law that entities the holder of a claim or interest to receive accelerated payment of his claim or interest after the occurrence of a default:

(A)　　cures any default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code;

(B)　　reinstates the maturity of such claim or interest as it existed before the default;

(C)　　compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

(D)　　does not otherwise alter the legal equitable, or contractual rights to which such claim or equity interest entities the holder of such claim or interest.

79.     553 West Class 4 and SE Class 3 are impaired under the Plan and are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.

80.     Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Claim in by a Creditor whose Claim is subject to an objection. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Court to confirm the Plan.

81.     A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

82.     The Bankruptcy Code defines acceptance of a Plan by a class of Creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the Claims of that class which actually cast ballots for acceptance or rejection of the Plan, i.e., acceptance takes place only if two-thirds in amount and a majority in number of the Creditors actually voting cast their ballots in favor of acceptance.

83. The Bankruptcy Code defines acceptance of a Plan by a class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of such class held by holders of such interests.

## CONFIRMATION OF THE PLAN

84. Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

85. By order of the Bankruptcy Court dated _____, 2011, the Confirmation Hearing has been scheduled for _____, 2011, in Judge Lane's Courtroom, United States Bankruptcy Court, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned Confirmation Hearing. Any objection to confirmation of the plan must be made in writing and filed with the Bankruptcy Court with proof of service and served upon the following on or before _____, 2011:

Backenroth Frankel & Krinsky, LLP
489 Fifth Avenue
New York, New York 100 17
Mark A. Frankel, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

86.     At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an order confirming the Plan.  The applicable requirements are as follows:

a.     The Plan Complies with the applicable provisions of the Bankruptcy Code;

b.     The Debtors have complied with the applicable provisions of the Bankruptcy Code;

c.     The Plan has been proposed in good faith and not by any means forbidden by law;

d.     Any Payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

e.     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and equity security holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the reorganized Debtors, and the nature of any compensation for such insider;

f.     With respect to each class of impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date of the Plan, in an amount that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code;

g.     Each class of Claims or interests has either accepted the Plan or is not impaired under the Plan;

h.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and priority Claims will be paid in full on the Effective Date;

i.      At least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such class; and

j.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan unless such liquidation or reorganization is proposed in the Plan.

87.      The Debtors believe that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in good faith.

88.      The Debtors contend that holders of all Claims impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

## CONFIRMATION OVER THE OBJECTION OF AN IMPAIRED CLASS

89.      In the event that any impaired class of Claim does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired

class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." The Debtors may invoke the provisions of section 1129(b) to any impaired class that does not accept the Plan.

90. A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives less than it is legally entitled to receive for its Claims or equity interests. "Fair and equitable" has different meanings for Secured and Unsecured Claims.

91. With respect to a Secured Claim, "fair and equitable" means either:

(a) the impaired Secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Effective Date at least equal to the value of such Creditor's interest in the property securing its Liens;

(b) property subject to the Lien of the impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of the sale; or

(c) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

92. With respect to an Unsecured Claim, "fair and equitable" means either:

(a) each impaired Unsecured Creditor receives or retains property of a value equal to the amount of its Allowed Claim; or

(b) the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

93.    In the event one or more classes of impaired Claims rejects the plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

**CONCLUSION**

The Debtors urge the Debtors' Creditors to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than _____, 2011.

Dated: New York, New York
October 26, 2011

**553 West 174th St LLC**

By: s/Jennifer Miller, as Trustee of the White Oak Profit Sharing Plan, General Partner of SE Opportunity Fund LP, as Managing Member

**SE Opportunity Fund LP**

By: s/Jennifer Miller, as Trustee of the White Oak Profit Sharing Plan, as General Partner of SE Opportunity Fund LP

**BACKENROTH FRANKEL & KRINSKY, LLP**
Attorneys for the Debtors

By: s/Mark Frankel
489 Fifth Avenue
New York, New York 10017
(212) 593-1100

# Exhibit A

**BACKENROTH, FRANKEL & KRINSKY, LLP**
489 5th Avenue
New York, New York  10017
(212) 593-1100
Counsel to the Debtors-in-Possession


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re                                                                    Chapter 11

553 West 174th St LLC,                                        Case No. 11-14968

                            Debtor.
-------------------------------------------------------------x
In re                                                                    Chapter 11

SE Opportunity Fund LP,                                     Case No. 11-14970

                            Debtor.
-------------------------------------------------------------x


## JOINT PLAN OF REORGANIZATION

**<u>INTRODUCTION</u>**

553 West 174th St LLC ("553 West") and SE Opportunity Fund, LP, ("SE," collectively with 553 West, the "Debtors"), propose this Plan of Reorganization for each of the Debtors. **UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG EACH OF THE DEBTORS, EACH OF THE DEBTORS' CREDITORS, AND THE INTEREST HOLDERS (AS ALL SUCH TERMS ARE DEFINED BELOW)**.

**ARTICLE 1**

**<u>DEFINITIONS</u>**

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.1     **<u>553 West</u>** shall mean 553 West 174th St LLC.

1.2     **<u>Administrative Expense</u>** Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, and any fees or charges assessed against the Debtors' Estate under Chapter 123, Title 28, United States Code.

1.3    **<u>Administrative Expense Claim</u>**  A claim for payment of an Administrative Expense.

1.4    **<u>Allowance Date</u>** shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

1.5    **<u>Allowed Claim</u>** shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Debtors' schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

1.6    **<u>Allowed Secured Claim</u>** shall mean an Allowed Claim for which a Claimant asserts and is determined by a Final Order to hold a valid, perfected and enforceable Lien, security interest or other interest or encumbrance in property in which the Debtors have an interest not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law, or an Allowed Claim for which a Claimant asserts a setoff under Section 553 of the Bankruptcy Code and such Claim is allowed by Final Order, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Claimant's interest in the Debtors' interest in the property or to the extent of the amount subject to such setoff, as the case may be.

1.7     **"Allowed Unsecured Claim"** shall mean an Unsecured Claim to the extent same is allowed.

1.8     **"Bankruptcy Case"** shall mean these Chapter 11 bankruptcy cases of the Debtors.

1.9     **"Bankruptcy Code"** shall mean Title 11 of the United States Code (11. U.S.C. § 101 et. seq.), as in effect on the Petition Date and as amended during the Bankruptcy Case.

1.10    **"Bankruptcy Court"** shall mean the Court as defined below.

1.11    **"Cash"** shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

1.12    **"Claim"** shall mean a right to payment as set forth in § 101(5) of the Bankruptcy Code.

1.13    **"Claimant"** shall mean the holder of a Claim.

1.14    **"Confirmation Date"** shall mean the date of the entry of the Confirmation Order.

1.15    **<u>Confirmation Hearing</u>"** shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

1.16    **"<u>Confirmation Order</u>"** shall mean the order of the Court confirming the Plan.

1.17    **"<u>Court</u>"** shall mean the United States Bankruptcy Court for the Southern District of New York.

1.18    **"<u>Creditor</u>"** shall mean any entity that holds a claim against a Debtor.

1.19    **"<u>Debtors</u>"** 553 West 174th St LLC ("553 West") and SE Opportunity Fund, LP.

1.20    **"<u>Disputed Claim</u>"** shall mean the whole or any portion of any claim against a Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

1.21    **"<u>Effective Date</u>"** shall mean 10 days after the Confirmation Order is a Final Order, or such earlier date or later date as may be practical, but in no event later than 45 days after the Confirmation Order is a Final Order.

1.22    **"<u>Estate</u>"** shall mean the estate of a Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

1.23    **"Executory Contracts"** shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

1.24    **"Final Order"** shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

1.25    **"Interest"** shall mean an existing ownership interest in a Debtor.

1.26    **"Interest Holder"** shall mean a holder and owner of an existing Interest in a Debtor.

1.27    **"Lien"** shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

1.28    **"Mortgagee"** shall mean Walter Tillow.

1.29    **"Petition Date"** shall mean October 26, 2011, the date of the filing of the Bankruptcy Cases by the Debtors.

1.30    **"Plan"** shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

1.31    **"SE"** shall mean SE Opportunity Fund LP.

1.32    **"Secured Claim"** shall mean a Claim secured by a Lien on property included within a Debtor's Estate.

1.33    **"Secured Creditor"** shall mean the owner or holder of a Secured Claim.

1.34    **"Unsecured Claim"** shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against property of a Debtor or a Debtor's Estate; (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim  includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code, and does not include administrative of priority claims.

1.35    **"Unsecured Creditor"** shall mean the owner or holder of an Unsecured Claim.


# ARTICLE 2

## CLASSIFICATION AND TREATMENT OF CLAIMS

### 553 West Class 1: New York City Lien Charges

2.1    **Classification** – Real estate tax, water, sewer and other lien charges held by the City of New York which is constitute first liens on the Property.

2.2    **Treatment** – Payment in full in cash with interest at the statutory rate on the Effective Date.

2.3    **Voting** – Unimpaired and is deemed to have accepted the Plan

### 553 West Class 2: First Mortgage

2.4    **Classification** – Class 2 consists of the first mortgage on the Property held by Walter Tillow.

2.5    **Treatment** – Payment in full in cash plus interest at the contract rate on the Effective Date.

2.6    **Voting** – Impaired and is entitled to vote to accept or reject the Plan.

## 553 West Class 3: Priority Claims

2.7     **Classification** – Allowed Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), (7) and (8) of the Bankruptcy Code. The Debtor is aware of no Class 3 Claims.

2.8     **Treatment** – Payment in full in cash with interest at the statutory rate on the Effective Date.

2.9     **Voting** – Unimpaired and are deemed to accept the Plan.

## 553 West Class 4: General Unsecured Creditors

2.10     **Classification** – Allowed Unsecured Claims.

2.11     **Treatment** – On the Effective Date, each Claimant shall be paid its pro-rata share of the funds available after payment of administration claims and Classes 1 through Class 3 Claims, up to Allowed Amount of its Claim, plus interest from the Petition Date at the Legal Rate.

2.12     **Voting** – Impaired and is entitled to vote accept or reject the Plan.

## 553 West Class 5: Equity Interests

2.13     **Classification** – Equity security holders.


2.14     **Treatment** -- Entitled to maintain ownership of their shares, as diluted after the exercise of Class 4 treatment under the Plan, in exchange for advancing sufficient funds to pay the Effective Date amounts due under the Plan.


2.15     **Voting** – Impaired and is entitled to vote accept or reject the Plan.


**SE Class 1: Priority Claims**


2.16     **Classification** – Allowed Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), (7) and (8) of the Bankruptcy Code.


2.17     **Treatment** – Payment in full in cash on the Effective Date with interest at the statutory rate.


2.18     **Voting** – Unimpaired and are deemed to accept the Plan.

**SE Class 2: General Unsecured Creditors**

2.19    **Classification** – Allowed Unsecured Claims.

2.20    **Treatment** – On the Effective Date, each Claimant shall be paid its pro-rata share of SE's available funds available after payment of administration claims and Class 1 Claims, up to Allowed Amount of its Claim, plus interest from the Petition Date at the Legal Rate.

2.21    **Voting** – Impaired and is entitled to vote accept or reject the Plan.

**Class 6: Equity Interests**

2.22    **Classification** – Equity security holders.

2.23    **Treatment** – Payment of the funds available after payment of administration claims and Classes 1 and Class 2 Claims on the Effective Date.

2.24    **Voting** – Impaired and is entitled to vote accept or reject the Plan.

# ARTICLE 3

## ADMINISTRATIVE EXPENSES

3.1     Allowed Administrative Expenses shall be paid in full in Cash on the Effective Date, or the date such Administrative Expense becomes Allowed, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtors shall be Paid in full or performed by the Debtors in the ordinary course of business or pursuant to the terms and conditions of the particular transaction. Any outstanding U.S. Trustee fees shall be paid in full in Cash on the Effective Date.  Post-confirmation United States Trustee fees will be paid, and operating reports will be filed as they come due by the Debtors.

# ARTICLE 4

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1     Property Transfer - Effective Date Plan payments, including payment of administration claims, shall be made from the proceeds of sale of the Property.  The Debtor shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan, including, without limitation, selling the Property to Adam Berkowitz substantially on the terms and conditions of the contract annexed to the Plan as Exhibit A, subject to higher

and better offers pursuant to the sale procedures, as annexed to the Plan as Exhibit B. The transfer of the Property under the Plan shall be free and clear of liens, claims and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds, and disbursed under the Plan.

4.2     Sale Approval -- As part of the sale under the Plan, and in order to ensure consummation of the Plan, the Plan requires that the Confirmation Order contain the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

4.3     Break-Up Fees/Bid Protections – As provided in the contract (Exhibit A to the Plan) of 553 West to sell the Property to Adam Berkowitz, Mr. Berkowitz shall have be entitled to a "break-up" fee as the "stalking horse" bidder pursuant to the sale procedures for the Property.

The break-up fee (the "Break-Up Fee") shall be $100,000 and shall be paid only if (a) 553 West fails to consummate the sale to Mr. Berkowtiz as a result of the Debtor's acceptance of a competing offer and closing on a sale pursuant to that competing offer or (b) Mr. Berkowitz becomes the purchaser at a price higher than $5,500,000. No Break-Up Fee shall be payable if Mr. Berkowitz is in breach of his obligations under his contract with 553 West (Exhibit A to the Plan). The Break-Up Fee shall be paid solely from the proceeds of the competing offer over and above the contract price, and Mr. Berkowitz shall have no other recourse against the Debtors for the Break-Up Fee. The minimum first competing offer at the Auction shall be an amount that is not less than $50,000 over the contract price set forth in Exhibit A to the Plan.

4.4     Release of Liens -- In order to facilitate the sale to the Purchaser free and clear of all liens claims and encumbrances, on the Effective Date, except as otherwise provided in the Plan, and/or the Confirmation Order, and concurrent with payment on the Effective Date, the Plan provides that each holder of a Secured Claim, shall on the Effective Date (a) turn over and release to the Reorganized Debtor any and all Collateral that secures or purportedly secures such Claim, as it pertains to the property owned by the Debtor or such Lien shall automatically, and without further action by the Debtor or the Reorganized Debtor, be deemed released, and (b) execute such documents and instruments as the Reorganized Debtor requests to evidence such Claim holder's release of such property or Lien.

4.5     Transfer Tax -- Under the Plan, pursuant to Bankruptcy Code § 1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any

other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax.

4.6    Vesting of Assets -- Except as otherwise provided in the Plan, on the Effective Date all assets and properties of the Estate shall vest in the Debtor free and clear of all commercial leases Liens, Claims and encumbrances and any and all liens, claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date.  Except as otherwise provided herein, as of the Effective Date, all property of the Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

4.7     Execution of Documents -- The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

4.8     Recording Documents -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

**ARTICLE 5**
**PROVISIONS FOR THE RETENTION, ENFORCEMENT**
**AND SETTLEMENT OF CLAIMS BELONGING TO THE**
**DEBTOR OR THE DEBTORS' ESTATE**

5.1     The right to pursue preference, fraudulent conveyances or other types of claims under 11 U S.C. §544(b), 547, 548, 549, and 550 or applicable state law will survive the Plan, , and the Debtors shall have the exclusive right to prosecute such claims.

## ARTICLE 6
## PROVISIONS FOR THE RESOLUTION OF DISPUTED
## CLAIMS AND OBJECTIONS TO PROOFS OF CLAIM

6.1 **Objections to Claims**.  The Debtors reserve their rights to file objections to

Claims in the event grounds exist to object to particular Claims.  Such objections will be filed no

later than 120 days after the Effective Date.  In the event that objections to claims are filed, the

amount of distributions that may have to be made on such claims shall be segregated by the

Debtors until the resolution of such objections.

## ARTICLE 7

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 **Assumption**.   All unexpired leases and executory contracts not rejected prior to

the Effective Date shall be assumed under the Plan.  The Debtors are landlords to various tenants

and none of those tenancies will be disturbed under the Plan.

7.2 **Claims Upon Rejection**.  In the event of a rejection of any Executory Contract

which results in damage to the other party or parties to the Executory Contract, a Proof of Claim

for such damages must be filed by the damaged party with the Court within sixty (60) days after

the Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract

shall be treated as an Unsecured Claim.

7.3    **Failure to File**.  Any Claim arising from the rejection of any Executory Contract not filed with the Court within the time period provided in the preceding paragraph above shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

# ARTICLE 8

# RETENTION OF JURISDICTION

8.1    **Retention of Jurisdiction**.  The Court shall have jurisdiction over all matters arising under, arising in, or relating to the Debtors' Bankruptcy Cases including, but not limited to, proceedings:

8.1.1    To consider any modification of the Plan under section 1127 of the Bankruptcy Code;

8.1.2    To hear and determine all Claims, controversies, suits and disputes against the Debtors to the full extent permitted under 18 U.S.C. §1334 and 28 U.S.C. §157.

8.1.3    To hear, determine and enforce all Claims  and causes of action which may exist on behalf of the Debtors or the Debtors' estate, including, but not limited to, any right of the Debtors or the Debtors' Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

8.1.4    To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

8.1.5    To value assets of the Estate.

8.1.6    To enforce the Confirmation Order, the final decree, and all injunctions therein;

8.1.7    To enter an order concluding and terminating the Bankruptcy Case;

8.1.8    To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

8.1.9    To determine all questions and disputes regarding title to the assets of the Debtors.

8.1.10   To re-examine Claims which may have been allowed for purposes of voting, and to determine objections which may be filed to any Claims.

# ARTICLE 9

## GENERAL PROVISIONS

9.1     **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

9.2     **No Payment of Disputed Claims**.  This Plan contemplates the payment of Allowed Claims only.  No Disputed Claims shall be paid, nor shall distributions be made to a creditor holding a Disputed Claim, until such Claim, or any part thereof, becomes an Allowed Claim, if ever.

9.3     **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

9.4     **Other Actions**.  Nothing contained herein shall prevent the Debtors, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

# ARTICLE 10

## MODIFICATIONS

      10.1    **Modification of Plan.**  The Debtors may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Debtors may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

# ARTICLE 11

## VESTING OF PROPERTY OF THE ESTATE

      11.1    **Vesting of Property**.  Except as otherwise provided in the Plan, on the Effective Date title to all of the Debtors' assets shall pass to the Debtors or their designee free and clear of all Claims and Interests, in accordance with Section 1141 of the Bankruptcy Code.

**ARTICLE 12**

**CLOSING THE CASE**

     12.1    Upon substantial consummation, the Debtors may move for a final decree to close the Bankruptcy Case and to request such other orders as may be just.

Dated: New York, New York
       October 26, 2011

**553 West 174ᵗʰ St LLC**

By:    s/Jennifer Miller, as Trustee of the White Oak Profit
          Sharing Plan, General Partner of SE Opportunity
          Fund LP

**SE Opportunity Fund LP**

By:    s/Jennifer Miller, as Trustee of the White Oak Profit
          Sharing Plan, General Partner of SE Opportunity
          Fund LP

**BACKENROTH FRANKEL & KRINSKY, LLP**
Attorneys for the Debtors

By:       s/Mark Frankel
          489 Fifth Avenue
          New York, New York 10017
          (212) 593-1100

22

# EXHIBIT A

# RESIDENTIAL CONTRACT OF SALE

*Jointly Prepared by the Real Property Section of the New York State Bar Association, the New York State Land Title Association, the Committee on Real Property Law of the Association of the Bar of the City of New York and the Committee on Real Property Law of the New York County Lawyers' Association. (11/00)*

## CONSULT YOUR LAWYER BEFORE SIGNING THIS CONTRACT.

**NOTE: FIRE AND CASUALTY LOSSES AND CONDEMNATION.** This contract form does not provide for what happens in the event of fire or other casualty loss or condemnation before the title closing. Unless different provision is made in this contract, Section 5-1311 of the General Obligations Law will apply. One part of that law makes a Purchaser responsible for fire and casualty loss upon taking possession of the Premises before the title closing.

**WARNING: PLAIN LANGUAGE.** No representation is made that this form of contract for the sale and purchase of real estate complies with Section 5-702 of the General Obligations Law ("Plain Language").

**CONTRACT OF SALE** made as of      | October 25 | , **2011**      between

    **553 West 174th Street, LLC**
Address: ~~2 West 45th Street, Room 1704, New York, New York 10036~~
    | 314 WEST 82ND STREET, NEW YORK, NY 10024 |
Social Security Number/Fed. I. D. No(s):                  hereinafter called "Seller" and

    **Adam Berkowitz**
Address: **424 West End Avenue, Unit 21C, New York, New York 10024**

Social Security Number/Fed. I. D. No(s):                  hereinafter called "Purchaser."

**The parties hereby agree as follows:**

1. **Premises.** Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "Premises"), more fully described on a separate page marked "Schedule A." annexed hereto and made a part hereof and also known as:
Street Address: **120 West 74th Street, New York, New York 10023**
Tax Map Designation: **Block 1145, Lot(s) 41, New York County**
Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages.

2. **Personal Property.** This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. ~~They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, door mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins not excluded below. (strike out inapplicable items).~~

| to the extent
| presently existing |

Excluded from this sale are furniture and household furnishings and

~~3. Purchase Price: The purchase price is~~
~~payable as follows:~~                                                                                    $ [ ]

~~(a) on the signing of this contract, by Purchaser's good check payable to the Escrowee (as hereinafter defined), subject to~~
~~collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract (the~~
~~"Downpayment");~~

~~(b) by allowance for the principal amount unpaid on the existing mortgage on the date hereof, payment of which Purchaser~~
~~shall assume by joinder in the deed:~~                                                                    $

~~(c) by a purchase money note and mortgage from Purchaser to Seller:~~                                     $

~~(d) balance at Closing in accordance with paragraph 7:~~                                                  $ [ ]

~~4. Existing Mortgage. (Delete if inapplicable) If this sale is subject to an existing mortgage as indicated in paragraph 3(b) above:~~

~~(a) The Premises shall be conveyed subject to the continuing lien of the existing mortgage, which is presently payable, with~~
~~interest at the rate of          percent per annum, in monthly installments of $          which include principal,~~
~~interest and escrow amounts, if any, and with any balance of principal being due and payable on~~

~~(b) To the extent that any required payments are made on the existing mortgage between the date hereof and Closing which~~
~~reduce the unpaid principal amount thereof below the amount shown in paragraph 3(b), then the balance of the price payable at~~
~~Closing under paragraph 3(d) shall be increased by the amount of the payments of principal. Seller represents and warrants that the~~
~~amount shown in paragraph 3(b) is substantially correct and agrees that only payments required by the existing mortgage will be~~
~~made between the date hereof and Closing.~~

~~(c) If there is a mortgage escrow account, Seller shall assign it to Purchaser, if it can be assigned, and in that case Purchaser~~
~~shall pay the amount in the escrow account to Seller at Closing.~~

~~(d) Seller shall deliver to Purchaser at Closing a certificate dated not more than 30 days before Closing signed by the holder~~
~~of the existing mortgage, in form for recording, certifying the amount of the unpaid principal, the date to which interest has been~~
~~paid and the amounts, if any, claimed to be unpaid for principal and interest, itemizing the same. Seller shall pay the fees for~~
~~recording such certificate. If the holder of the existing mortgage is a bank or other institution as defined in Section 274-a of the Real~~
~~Property Law it may, instead of the certificate, furnish a letter signed by a duly authorized officer, employee or agent, dated not more~~
~~than 30 days before Closing, containing the same information.~~

~~(e) Seller represents and warrants that (i) Seller has delivered to Purchaser true and complete copies of the existing mortgage,~~
~~the note secured thereby and any extensions and modifications thereof, (ii) the existing mortgage is not now, and at the time of~~
~~Closing will not be, in default, and (iii) the existing mortgage does not contain any provision that permits the holder of the mortgage~~
~~to require its immediate payment in full or to change any other term thereof by reason of the sale or conveyance of the Premises.~~

~~5. Purchase Money Mortgage. (Delete if inapplicable) If there is to be a purchase money mortgage as indicated in paragraph~~
~~3(c) above:~~

~~(a) The purchase money note and mortgage shall be drawn by the attorney for Seller in the form attached or, if not, in the~~
~~standard form adopted by the New York State Land Title Association. Purchaser shall pay at Closing the mortgage recording tax,~~
~~recording fees and the attorney's fees in the amount of $          for its preparation.~~

~~(b) The purchase money note and mortgage shall also provide that it is subject and subordinate to the lien of the existing~~
~~mortgage and any extensions, modifications, replacements or consolidations of the existing mortgage, provided that (i) the interest~~
~~rate thereof shall not be greater than          percent per annum and the total debt service thereunder shall not be greater than~~
~~$          per annum, and (ii) if the principal amount thereof shall exceed the amount of principal owing and unpaid on the~~
~~existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such~~
~~purchase money mortgage in reduction of the principal thereof. The purchase money mortgage shall also provide that such payment~~
~~to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and that the holder~~
~~thereof will, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements further to~~
~~effectuate such subordination.~~

**6. Downpayment in Escrow.** (a) Seller's attorney ("Escrowee") shall hold the Downpayment in escrow in a segregated bank
account at
Address:

until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of
this paragraph. Escrowee shall hold the Downpayment in a(n)          interest-bearing account for the benefit of the parties. If
interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the
interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in
an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties
shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason
Closing does not occur and either party gives Notice (as defined in paragraph 25) to Escrowee demanding payment of the
Downpayment. Escrowee shall give prompt Notice to the other party of such demand. If Escrowee does not receive Notice of

objection from such other party to the proposed payment within 10 business days after the giving of such Notice, Escrowee is hereby authorized and directed to make such payment. If Escrowee does receive such Notice of objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

    (b)   The parties acknowledge that, Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

    (c)   Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel.

    (d)   Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

    (e)   Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

    (f)   The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

7.   **Acceptable Funds.** All money payable under this contract, unless otherwise specified, shall be paid by:
    (a)   Cash, but not over $1,000.00;
    (b)   Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;
    (c)   As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $ 1,000.00   ; and
    (d)   As otherwise agreed to in writing by Seller or Seller's attorney.

~~8. Mortgage Commitment Contingency. (Delete paragraph if inapplicable. For explanation, see Notes on Mortgage Commitment Contingency Clause.)~~

~~(a) The obligation of Purchaser to purchase under this contract is conditioned upon issuance, on or before _____ days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or subparagraph 8(j) (the "Commitment Date"), of a written commitment from an Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $ _____ for a term of at least _____ years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is conditioned on the sale of Purchaser's current home, payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date, Purchaser may cancel under subparagraph 8(e) unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. Once a Commitment is issued, Purchaser is bound under this contract even if the lender fails or refuses to fund the loan for any reason.~~

~~(b) Purchaser shall (i) make prompt application to one or, at Purchaser's election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. Purchaser shall accept a Commitment meeting the terms set forth in subparagraph 8(a) and shall comply with all requirements of such Commitment (or any other commitment accepted by Purchaser). Purchaser shall furnish Seller with a copy of the Commitment promptly after receipt thereof.~~

~~(c) (Delete this subparagraph if inapplicable.) Prompt submission by Purchaser of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the~~

terms and conditions set forth in subparagraph 8(b)(i), provided that such Mortgage Broker promptly submits such application to such Institutional Lender(s). Purchaser shall cooperate in good faith with such Mortgage Broker to obtain a Commitment from such Institutional Lender(s).

(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date, Purchaser may cancel this contract by giving Notice thereof to Seller, with a copy of such denials, provided that Purchaser has complied with all its obligations under this paragraph 8.

(e) If no Commitment is issued by the Institutional Lender on or before the Commitment Date, then, unless Purchaser has accepted a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, provided that such Notice includes the name and address of the Institutional Lender(s) to whom application was made and that Purchaser has complied with all its obligations under this paragraph 8.

(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in paragraph 27.

(g) If Purchaser fails to give timely Notice of cancellation or if Purchaser accepts a written commitment from an Institutional Lender that does not conform to the terms set forth in subparagraph 8(a), then Purchaser shall be deemed to have waived Purchaser's right to cancel this contract and to receive a refund of the Downpayment by reason of the contingency contained in this paragraph 8.

(h) If Seller has not received a copy of a commitment from an Institutional Lender accepted by Purchaser by the Commitment Date, Seller may cancel this contract by giving Notice to Purchaser within 5 business days after the Commitment Date, which cancellation shall become effective unless Purchaser delivers a copy of such commitment to Seller within 10 business days after the Commitment Date. After such cancellation neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser (provided Purchaser has complied with all its obligations under this paragraph 8) and except as set forth in paragraph 27.

(i) For purposes of this contract, the term "Institutional Lender" shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(j) For purposes of subparagraph 8(a), Purchaser shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid.

9. **Permitted Exceptions.** The Premises are sold and to be conveyed subject to:

    (a)  Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

    (b)  Consents for the erection of any structures on, under or above any streets on which the Premises abut;

    (c)  Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

    (d)  Real estate taxes that are a lien, but are not yet due and payable; and

    (e)  The other matters, if any, including a survey exception, set forth in a Rider attached.

10. Governmental Violations and Orders. (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date hereof by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.

(b) (Delete if inapplicable) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

11. **Seller's Representations.** (a) Seller represents and warrants to Purchaser that:

    (i)  The Premises abut or have a right of access to a public road;

    (ii)  Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

    (iii)  Seller is not a "foreign person," as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA");

    (iv)  The Premises are not affected by any exemptions or abatements of taxes; and

    (v)  Seller has been known by no other name for the past ten years, except

(b)  Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c)  Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

**12.  Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of closing (except as otherwise set forth in paragraph 16(e)), without any reduction in the purchase price or claim of any kind for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

**13.  Insurable Title.** Seller shall give and Purchaser shall accept such title as  any reputable title insurance or abstract company licensed to do business in the state of New York
shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

**14.  Closing, Deed and Title. (a)** "Closing" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a  bargain and sale with covenant against grantor's acts
deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

(b)  If Seller is a corporation, it shall deliver to Purchaser at the time of Closing (i) a resolution of its Board of Directors authorizing the sale and delivery of the deed, and (ii) a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing that the transfer is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with that Section.

**15.  Closing Date and Place.** Closing shall take place at the office of ~~Purchaser's Attorney~~  | Seller's Attorney |

~~at       the       o'clock on       or about~~ November 21, 2011  ~~or upon reasonable notice (by telephone or otherwise) by Purchaser~~, at the office of  Purchaser's Lender's Counsel if applicable

**16.  Conditions to Closing.** This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

(a)  The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(b)  The delivery by Seller to Purchaser of a valid and subsisting Certificate of Occupancy or other required certificate of compliance, or evidence that none was required, covering the building(s) and all of the other improvements located on the property authorizing their use as a  multi
family dwelling at the date of Closing.

(c)  The delivery by Seller to Purchaser of a certificate stating that Seller is not a foreign person, which certificate shall be in the form then required by FIRPTA, or a withholding certificate from the I.R.S. If Seller fails to deliver the aforesaid certificate or if Purchaser is not entitled under FIRPTA to rely on such certificate, Purchaser shall deduct and withhold from the purchase price a sum equal to 10% thereof (or any lesser amount permitted by law) and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

(d)  The delivery of the Premises and all buildings(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

(e)  ~~All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the buildings(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.~~

(f)  If the Premises are a one or two family house, delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(g)  The delivery by the parties of any other affidavits required as a condition of recording the deed.

**17.  Deed Transfer and Recording Taxes.** At Closing, certified or official bank checks payable to the order of the appropriate

| Buyer is aware that the mechanical systems are not in use and may not be operational. |

State, City or County officer in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

**18. Apportionments and Other Adjustments; Water Meter and Installment Assessments.** (a) To the extent applicable, the following shall be apportioned as of midnight of the day before the day of Closing:

(i)   taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed; (ii) fuel; ~~(iii) interest on the existing mortgage; (iv) premiums on existing transferable insurance policies and renewals of those expiring prior to Closing; (v) vault charges; (vi) rents as and when collected.~~

(b)   If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c)   If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d)   If at the date of Closing the premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e)   Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

**19. Allowance for Unpaid Taxes, etc.** Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

**20. Use of Purchase Price to Remove Encumbrances.** If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient moneys with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

**21. Title Examination; Seller's Inability to Convey; Limitations of Liability.** (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed or authorized to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract or, if this contract is subject to the mortgage contingency set forth in paragraph 8, after a mortgage commitment has been accepted by Purchaser. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b)(i)If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract: (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date: (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same) and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c)   If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and, unless

cancelled as a result of Purchaser's default or pursuant to paragraph 8, to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 27 shall survive the termination of this contract.

**22. Affidavit as to Judgments, Bankruptcies, etc.** If a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

**23. Defaults and Remedies. (a)** If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

**24. Purchaser's Lien.** All money paid on account of this contract, and the reasonable expenses of examination of title to the Premises and of any survey and survey inspection charges, are hereby made liens on the Premises, but such liens shall not continue after default by Purchaser under this contract.

**25. Notices.** Any notice or other communication ("Notice") shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys who are hereby authorized to do so on their behalf or by the Escrowee, by registered or certified mail, postage prepaid, or

(b) delivered in person or by overnight courier, with receipt acknowledged, to the respective addresses given in this contract for the party and the Escrowee, to whom the Notice is to be given, or to such other address as such party or Escrowee shall hereafter designate by Notice given to the other party or parties and the Escrowee pursuant to this paragraph. Each Notice mailed shall be deemed given on the third business day following the date of mailing the same, except that any notice to Escrowee shall be deemed given only upon receipt by Escrowee and each Notice delivered in person or by overnight courier shall be deemed given when delivered, or

(c) with respect to ¶7(b) or ¶20, sent by fax to the party's attorney. Each Notice by fax shall be deemed given when transmission is confirmed by the sender's fax machine. A copy of each Notice sent to a party shall also be sent to the party's attorney. The attorneys for the parties are hereby authorized to give and receive on behalf of their clients all Notices and deliveries. This contract may be delivered as provided above or by ordinary mail.

**26. No Assignment.** This contract may not be assigned by Purchaser without the prior written consent of Seller in each instance and any purported assignment(s) made without such consent shall be void.

**27. Broker.** Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale other than **Cathy Connolly; Vandenberg, Inc.** See rider 18 and exhibit A attached hereto & made a part hereof.

~~("Broker") and Seller shall pay Broker any commission earned pursuant to a separate agreement between Seller and Broker.~~ Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representation or agreement contained in this paragraph. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

**28. Miscellaneous. (a)** All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributees, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

*Continued on addendum or rider attached hereto.*

IN WITNESS WHEREOF, this contract has been duly executed by the parties hereto.

~~Seth Miller~~, Seller    553 West 174th Street LLC      Adam Berkowitz, Purchaser

*Social Security No./Fed. I.D. No.*        *Social Security No./Fed. I.D. No.*

Seller                       Purchaser

*Social Security No./Fed. I.D. No.*        *Social Security No./Fed. I.D. No.*

Attorney for Seller: Abe Backenroth, Esq.
     Backenroth Frankel & Krinsky LLP
Address: 489 Fifth Avenue -28th floor
     New York, New York 10017
Tel.: (212) 593-1100      Fax: (212) 644-0544

Attorney for Purchaser: Steven Matz, Esq.
     Katz and Matz, PC
Address: 1350 Avenue of the Americas, 3rd Floor
     New York, New York 10019
Tel.: (212) 244-4630      Fax: (646) 219-5717

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 6.

Backenroth Frankel & Krinsky LLP

# RIDER TO CONTRACT OF SALE

| | |
|---|---|
| PREMISES: | 120 West 74th Street, New York, NY |
| SELLER: | 553 West 174th Street, LLC |
| PURCHASER: | Adam Berkowitz |
| DATED: | THE 25th DAY OF October, 2011 |

*The printed part of this Contract and other rider(s) annexed thereto are hereby modified and supplemented. Wherever there is any conflict between this Rider and the printed form of Contract and any other rider(s), the provisions of this Rider are paramount, shall govern, and the Contract shall be construed accordingly.*

The purchase price is $5,500,000.00 (five million five hundred thousand dollars) payable as follows:

(a) The Downpayment: On the singing of this contract, by Purchaser's good check payable to the Escrowee (as defined herein), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6 of this contract: $266,750.00 (two hundred sixty-six thousand seven hundred fifty dollars)

(b) Upon approval of the transfer of the premises to Purchasers by the Bankruptcy Court: An additional $283,250.00 (two hundred eighty three thousand two hundred fifty dollars).

(c) At Closing: The balance of $4,950,000.00 (four million nine hundred fifty thousand dollars).

1.  Seller warrants and represents that (a) at closing, the fixtures and personal property included in this sale are now and will be, on the date of the Closing, owned by Seller free and clear of any and all liens, encumbrances, security agreements, financing statements and other security interests of any kind.

2.  Seller shall maintain the Premises in its current condition and state of repair through and until the date of closing, reasonable wear and tear excepted. From the date hereof, Seller shall not perform alterations or renovations on the premises.

3.  Seller represents and warrants to Purchaser that (i) Seller is the owner of the Premises and (ii) Seller is not a "foreign person", as that term is defined for purposes of the Foreign Investment in Real Property Tax Act, Internal Revenue Code ("IRC") Section 1445, as amended, and the regulations promulgated thereunder (collectively "FIRPTA").

4.     Seller and Purchaser covenant and warrant that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

5.     Seller represents that upon possession by Purchaser, Seller shall deliver the Premises and all building(s) and improvements comprising a part thereof vacant and free from any tenancies, together with keys, and garage door openers if any, to the Premises.

6.     This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

7.     Seller represents that as of the execution of this contract, Seller is not aware of any violation of any type affecting the building that is not reflected in the applicable public records. Buyers sole remedy for a breach of the above representation is to terminate the contract within 3 business days of learning of the breach.

8.     Additionally, Seller shall use Seller's best efforts, promptly after receipt thereof, to deliver to Purchaser copies of any notices relating to:  (1) any intended or proposed assessment or increase in the amount of city or other taxes imposed on the Premises, (2) any necessary and proposed construction or repair work to the Premises, (3) any damage or casualty to the Premises, and (4) the status of pending and current litigation, arbitration, mediation or adversarial proceedings with any owners or tenants of property contiguous to the subject premises, and more specifically, the status of Seller's Chapter 11 Bankruptcy proceedings. Seller agrees to provide Purchaser with advance notice of the date, time and location of the Bankruptcy hearing for the disposition of the property.

9.     Intentionally deleted.

10.     Prior to signing this contract Seller has filed for protection under Chapter 11 of the Bankruptcy Code. Anything to the contrary herein notwithstanding, this contract and the rights granted thereunder is subject to Bankruptcy Court approval. Seller warrants that within 10 days of the signing of the Contract it will file a motion to conduct a 363 sale of the property free and clear of all liens and encumbrances and claims. Should Seller fail to file said motion timely, Purchaser may cancel this contract by written notice to Seller.   The following provisions shall also apply:

a)   Within 75 (seventy-five) calendar days of the date herein, Seller shall present Purchaser with an order of the Court, consenting to the sale of the premises, proving the ability to convey a clear title, from any and all liens and/or encumbrances ("the Sale Order").  In the event Seller is unable to perform under this provision, Purchaser shall have the sole and exclusive right to either a) terminate this Contract of Sale and be returned the down payment in full, or b) grant Seller additional periods of 15 days to procure Bankruptcy Court consent.

b) The closing shall take place within 45 days of the presentation of the Sale Order, as hereinafter defined, to Purchaser.

11.    On reasonable notice to Seller, Purchaser and Purchaser's architects, decorators, contractors or other authorized person may have access to the entire Premises a reasonable number of times for the purpose of taking measurements and similar purposes, in addition to the Purchaser's right to a final "walk through" inspection of the premises, prior to closing.

12.    Seller acknowledges that Purchaser intends to bring architects and other professionals to the premises, prior to closing, for the purpose of creating renovation drawings, blueprints, schematics and scopes of work.

13.    To the best of Seller's knowledge, there is no asbestos, or storage or disposal of asbestos waste at the demised premises, nor claims to date with reference to radon gas, lead paint hazard or other toxic or hazardous wastes in or around the premises.

14.    Seller represents that there are no underground oil storage tanks on the premises.

15.    All dates and contingencies set forth herein shall be deemed effective as of the date Purchaser or Purchaser's attorney receives a fully executed copy of this Contract.

16.    The risk of loss or damage to the premises or to the personal property included in this sale, by fire or other casualty, until the Closing is assumed by Seller, but without any obligation of Seller to repair or replace any such loss or damage, unless Seller elects to do so. Seller shall notify Purchaser of its intentions whether or not it elects to repair/restore the damage or loss. If Seller elects to repair/restore, the closing date may be adjourned for up to 60 days after the date of Seller's notice of its election. If Seller does not choose to repair/restore, or the repair/restoration takes longer than 60 days from the date of Seller's election, Purchaser shall have the right to a) declare the contract cancelled and of no further effect and receive a refund of the down payment, OR b) complete the purchase in accordance with the Contract without a reduction in purchase price, however, any insurance proceeds received by Seller shall be turned over to Purchaser, and Seller shall assign to Purchaser the right to collect any further insurance proceeds which are attributable to the loss or casualty.

17.     Seller represents that any and all previous tenancies have been terminated, and that there are no claims of any kind to the premises or any part of the premises, by a previous tenant. The existence of any legal right of previous tenants to the premises this Paragraph shall constitute a material Breach of this Contract of Sale, providing Purchaser with the right to terminate the Contract and be returned their down payment in full.

18.     Reference is made to the Brokerage Agreement , attached hereto as "Exhibit A", between the Purchaser herein and Vandenberg Real Estate for services rendered in connection with this transaction. At the closing Seller shall , at the option of Purchaser, either pay the commission due pursuant to the Brokerage Agreement or credit the Purchaser an amount equal to the commission due.

19.     Supplementing and modifying Paragraph 17 of the Printed Portion of the Contract, upon closing, the Seller shall be responsible for the payment of the New York  State Transfer Tax and the New York City Transfer Tax, if any.

20.     Seller represents that the sales price indicated herein is sufficient to pay off all mortgage loans, applicable transfer taxes and any and all other customary, standard and usual closing costs for similar type properties.  This representation contained herein is a material inducement for Purchaser agreeing to enter into this Contract of Sale, and in the event of a misrepresentation made by Seller, Purchaser shall have the right to immediately cancel this Contract of Sale and receive a full refund of the Down Payment.

21.     Supplementing and modifying Paragraph 26 of the Printed Portion of the Contract, Purchaser shall have the right to assign this Contract of Sale, prior to closing, to an immediate family member, OR to an entity in which Purchaser is the majority owner.

22.     Seller will cooperate to the extent possible should Purchaser elect to assume Seller's existing mortgage and upon request, promptly provide loan information and associated documentation. Notwithstanding, there shall be no mortgage assumption unless mortgagee agrees to release the personal guarantee of Seth Miller. Purchaser may deal directly with mortgagee to provide any necessary inducement.

23.     Anything to the contrary notwithstanding, and in supplementing Paragraph 10, *supra,* the rights, responsibilities and obligations of the parties under this Contract are subject to an order of the bankruptcy court having jurisdiction of the Premises authorizing the sale of the Premises to the Purchaser free and clear of all liens, encumbrances and claims ("Sale Order"); and

(a) Authorizing the payment to Purchaser, prior to any hearing to approve the sale of the property by the Bankruptcy Court ,of a breakup fee of $100,000.00 (one hundred thousand dollars) (in addition to the return of Purchaser's full down payment), in the event that as part of Bankruptcy Court process and procedures, either (i) someone other than the Purchaser becomes the successful purchaser of the Premises; or (ii) the Purchaser becomes the successful purchaser at price higher than the Contract. ("Breakup Fee"). The Breakup Fee shall be payable only out of the proceeds of the sale over and above the Contract price herein.

(b) Requiring, as part of an auction process approved by the Bankruptcy Court, that any other third party bidder initially bid at least $50,000 (fifty thousand dollars) over and above the contract price to be considered by the Bankruptcy Court

24.     Purchaser's obligations hereunder are contingent upon Seller providing the following items to Purchaser:

    a) Copies of all motions, filings and pleadings with the Bankruptcy Court.
    b) Description of any and all advertisements for the premises, along with the name of the publication(s) and length of time paid to run.
    c) Written notification when advertising has been completed.
    d) Answers and responses from Bankruptcy Court as they issue.
    e) Written notification of the date, time and location of the Bankruptcy Hearing on the disposition of the premises when set.

Presentation of the any and all of the above may be given via electronic means or facsimile. Seller's non compliance with the provisions of this Paragraph shall give rise to Purchaser's right to cancel this Contract of Sale and be returned the down payment.

25.     The parties agree that signatures in counterparts, and via facsimile and/or pdf-electronic means shall be deemed legal and binding for purposes of this Contract of Sale.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have duly executed this Rider to Contract.

Seller :

Purchaser:

_____
For 553 West 174th Street, LLC

Adam Berkowitz

# DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT
## AND LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure (initial)**

_____ (a)    Presence of lead-based paint and/or lead-based paint hazards (check one below):

[ ]    Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

[x]    Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b)    Records and reports available to the seller (check one below):

[ ]    Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

_____

[x]    Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment (initial)**

_____ (c)    Purchaser has received copies of all information listed above.

_____ (d)    Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*.

_____ (e)    Purchaser has (check one below):

[ ]    Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

[x]    Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment (initial)**

_____ (f)    Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | | |
|---|---|---|---|
| Seller Seth Miller | Date | Seller | Date |
| Agent | Date | Agent | Date |
| Purchaser Adam Berkowitz | Date  10-25-11 | Purchaser | Date |

© 2004 Matthew Bender & Co., a member of the LexisNexis Group.

<u>**EXHIBIT B**</u>

<u>**TERMS AND CONDITIONS OF SALE**</u>

These Terms and Conditions of Sale are promulgated in connection with the auction sale (the "Sale") of certain real property located at 120 West 74th Street, New York, New York together with the personal property appurtenant thereto (the "Property").

<u>Time and Place of Sale</u>: The Sale will be held on _____, 2011 at ____ __ m. in Judge Lane's courtroom at the United States Bankruptcy Court, the Alexander Hamilton Custom House, One Bowling Green, New York, New York.

<u>Sale Pursuant to Chapter 11 Plan</u>: The Seller of the Property is 553 West 174th St LLC (the "Debtor"). The sale shall be conducted pursuant to Bankruptcy Code section 363 and the Debtor's Chapter 11 Plan of Reorganization (the "Plan").

<u>Existing Contract of Sale</u>: 553 West entered into a contract with Adam Berkowitz ("Purchaser"), to purchase the 553 West Property for $5,500,000, a copy of which is annexed to the Debtors' Plan as Exhibit A. This offer is subject to higher or better all cash offers tendered at the Sale.

<u>Sale free and Clear of Liens</u>: The Sale of the Property shall be conducted pursuant to the Debtors' Plan of Reorganization free and clear of liens, claims and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds, and disbursed under the Plan.

<u>Qualification to Bid</u>: In order to be qualified to bid on the Property, within seven days prior to the commencement of the Sale, each prospective bidder must deliver to 553 West (a) a bank check in the amount of Two Hundred Sixty-Six Thousand, Seven Hundred Fifty Dollars ($266,750) (the "Qualifying Deposit") payable to "Backenroth Frankel & Krinsky, LLC, as Attorneys for 553 West 174th St LLC," (b) evidence reasonably demonstrating such bidder's ability to consummate a sale on the terms proposed, and (c) a written offer to purchase substantially in the form annexed as Exhibit A to the Plan. No later than one business day before the Sale, each bidder will be notified by 553 West as to whether 553 West deems such bidder qualified to bid at the Sale.

<u>Bidding</u>: Bidding shall be conducted openly at the Sale in the Bankruptcy Court. The opening bid shall be $5,550,000. Minimum bidding increments shall be $25,000.

<u>Successful Bidder Additional Deposit</u>: At the Sale, once a bidder is determined to have made the highest or best bid for the Property at the sale (the "Successful Bidder"), bidding shall be deemed closed and no additional bids will be considered. Within one business day after the Successful Bidder is determined, the Successful Bidder shall be required to increase the Qualifying Deposit to an amount equal to ten percent of the winning bid, which amount shall serve as a good faith deposit against payment of the purchase price. At the conclusion of the Sale, the Debtor's counsel will return the Qualifying Deposits to all other bidders.

<u>Hearing if Disputed Sale</u>: In the event that an issue exists as to which competing bid is higher or better, a hearing will be conducted by the Bankruptcy Court on that issue at the conclusion of the Sale.

<u>Sale Approval Order</u>: the Confirmation Order confirming the Debtor's Plan shall approve the Sale, and in connection therewith, the Confirmation Order shall contain the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

<u>Closing</u>: The Successful Bidder must pay the balance of the Purchase Price for the Property (the difference between the amount of the successful bid and the Qualifying Deposit) to 553 West, by bank check, or wire transfer at the closing of title to the Property (the "Closing"). The Successful Bidder must close title to the Property at a date that is no more than forty-five (45) days after the Order by the Bankruptcy Court approving the Sale becomes final and non-appealable, TIME BEING OF THE ESSENCE as to the Successful Bidder, although such date may be extended solely by 553 West.

<u>Transfer Tax:</u> Under the Plan, pursuant to section 1146(c) Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax.

<u>Damages for Failure to Close</u>: Time is of the Essence as Against the Successful Bidder and the failure of the Successful Bidder to close for any reason whatsoever (except as otherwise provided below) including its failure to pay the balance of the Purchase Price on the Closing Date, will

result in 553 West retaining the deposit as liquidated damages and the termination of the Successful Bidder's right to acquire the Property under these Terms and Conditions of Sale. The Successful Bidder shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit the Successful Bidder to cancel or avoid its obligation under these Terms and Conditions of Sale other than 553 West's inability to deliver a bargain and sale deed to the Property. Expenses incurred by the Successful Bidder, or any competing bidder relating to any due diligence, such as obtaining title reports or environmental inspections, shall be the sole responsibility of such bidder, and under no circumstances shall 553 West or 553 West's professionals be responsible for, or pay, such expenses.

Backup Bidder: In the event that the Successful Bidder for the Property fails to tender the payment of the balance of the Purchase Price on the Closing Date, or otherwise perform any of its obligations under these terms and conditions of sale, 553 West, at its sole option, shall be authorized to sell the Property to the Second Highest Bidder without any further notice without giving credit for the Deposit forfeited by the Successful Bidder, and upon such other terms and conditions as 553 West deems appropriate. Should the Second Highest Bidder fail to close on the Property, within such time as the parties may agree but not to exceed thirty (30) days after notice from 553 West to the Second Highest Bidder, 553 West shall be authorized to sell the Property to the next highest or best bidder, without the necessity of any further notice. All bidders will be bound by these Terms and Conditions of Sale, including, without limitation, those items set forth in the paragraphs above, except that the Second Highest Bidder must close within thirty (30) days of notification that his bid is accepted.

No Representations: 553 West and 553 West's professionals have not made and do not make any representations as to the physical condition, rents, leases, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property or the Sale, which might be pertinent to the purchase of the Property, including, without limitation, (i) the current or future real estate tax liability, assessment or valuation of the Property; (ii) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (iv) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the Property; (vi) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (vii) the ownership or state of title of any personal property on the Property; (viii) the presence or absence of any laws, ordinances, rule or regulations issued by any governmental authority, agency or board and any violations thereof; (ix) any present or future issues concerning subdivision or non-subdivision of the Property; or (x) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos or other hazardous materials anywhere on the Property. Each bidder shall be deemed to have

agreed and acknowledged that no such representations have been made. 553 West is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Property, made or furnished by 553 West or any real estate broker agent, employee, servant or other person or professional representing or purporting to represent 553 West unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing by 553 West.

As Is Sale: The Property is being sold free and clear of all liens claims and encumbrances, with any such liens, claims and encumbrances to attach to the net proceeds of sale after deduction of any expenses of sale. Furthermore, the Property is being sold "AS IS", "WHERE IS" "WITH ALL FAULTS", without any representations, covenants, guarantees or warranties of any kind or nature whatsoever and subject to, among other things, (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof; and (e) environmental conditions. By delivering their respective Qualifying Deposits, each bidder is deemed to have acknowledged that it has had the opportunity to review and inspect the Property, the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on its own independent investigations and inspections of the Property in making its bid. Neither 553 West nor any of its representatives make any representations or warrantees with respect to the permissible uses of the Property, including but not limited to, the zoning of the Property. All bidders are deemed to have acknowledged that they have conducted their own due diligence in connection with the Property, and are not relying on any information provided by 553 West or 553 West's professionals.

Deed: 553 West shall convey the Property by delivery of a bargain and sale deed.

Broker: Except as set forth in the contract annexed to the Plan as Exhibit A, neither 553 West nor 553 West's counsel is liable or responsible for the payment of fees of any broker. The Contract with Berkowitz obligates 553 West to cover a $135,000 brokerage expense. That obligation will be a factor in determining the highest and best offer at the Sale.

Conduct of Sale: these Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Sale of the Property. By making a bid for the Property, all bidders will be required to acknowledge these Terms and Conditions of Sale and agree to be bound by them.

553 West's Failure to Close: If 553 West is unable to deliver title to the Property in accordance with these Terms and Conditions of Sale for any reason whatsoever or in the event that the Bankruptcy Court refuses to confirm the Debtors' Chapter 11 plan or approve the sale of the Property pursuant to Section 363 of the Bankruptcy Code, 553 West's only obligation will be to refund the Deposit, together with any interest earned thereon, if any, to the Successful Bidder, and upon such refund, the Successful Bidder will have no claim or recourse against 553 West or 553 West's professionals.

Right to Withdraw Sale: 553 West reserves its right to withdraw the Property from the Sale,

either prior or subsequent to the Sale, for any reasonable reason, as 553 West deems necessary or appropriate.

<u>Plan Confirmation</u>:  The Sale of the Property is subject to confirmation of the Debtors' Plan and approval by the Bankruptcy Court.

<u>Breakup Fee</u>:  As provided in the contract (Exhibit A to the Plan) of 553 West to sell the Property to Adam Berkowitz, Mr. Berkowitz shall have be entitled to a "break-up" fee as the "stalking horse" bidder pursuant to the sale procedures for the Property.  The break-up fee (the "Break-Up Fee") shall be $100,000 and shall be paid only if (a)  553 West fails to consummate the sale to Mr. Berkowtiz as a result of the Debtor's acceptance of a competing offer and closing on a sale pursuant to that competing offer or (b) Mr. Berkowitz becomes the purchaser at a price higher than $5,500,000.  No Break-Up Fee shall be payable if Mr. Berkowitz is in breach of his obligations under his contract with 553 West (Exhibit A to the Plan). The Break-Up Fee shall be paid solely from the proceeds of the competing offer over and above the contract price, and Mr. Berkowitz shall have no other recourse against the Debtors for the Break-Up Fee.  The minimum first competing offer at the Auction shall be an amount that is not less than $50,000 over the contract price set forth in Exhibit A to the Plan.

<u>Bankruptcy Court Jurisdiction</u>:  The Bankruptcy Court shall determine any disputes concerning the Sale of the Property.  By participating in the Sale, all bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Debtors' pending cases.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re                                                    Chapter 11

553 West 174th St LLC,                                    Case No. 11-

                                    Debtor.
-----------------------------------------------------------x

## NOTICE OF SALE

PLEASE TAKE NOTICE, that upon the application of 553 West 174th St LLC ("Debtor"), a hearing ("Hearing") will be held on _____ at _____ __.m., or as soon thereafter as counsel can be heard, before the Honorable Sean H. Lane, at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004, to approve the sale of that certain property located at 120 West 74th Street, New York, New York, together with the personal property appurtenant thereto ("Property") to Adam Berkowitz or its designee ("Berkowitz") for $5,500,000, subject to higher and/or better offers. The Property shall be sold "as is." Bidding shall be limited to all cash offers, and the minimum opening bid shall be $5,550,000, and bidding shall be increments of $25,000. All prospective bidders shall be required to deposit $266,750 (the "Deposit") in escrow with the undersigned Debtor's counsel by bank check or wire deposit on or before _____, 2011 at 5:00 p.m. The highest bidder at the Hearing shall be the purchaser (the "Purchaser") of the Property, free and clear of all liens, claims and encumbrances, with any such liens, claims and encumbrances to attach to the proceeds of sale. The Deposit shall be non-refundable. In the event the Purchaser closes on or before forty-five days after the entry of an order approving the sale, the Deposit shall be applied to the purchase price. In the event Purchaser fails to close on or before forty-five days after the entry of an order approving the sale, the Deposit shall be remitted to the Debtor. Time shall be of the essence in the closing of this transaction. In the event Purchaser fails to close as set forth herein, then the Debtor shall have the right to accept the bid next highest in amount to the original Purchaser's bid.

PLEASE TAKE FURTHER NOTICE, that a complete copy of the terms and conditions of sale is attached to the Debtor's Chapter 11 plan filed in the Bankruptcy Court and is available upon request of the undersigned.

Dated: New York, New York
          _____, 2011

                                        Backenroth Frankel & Krinsky, LLP
                                        489 Fifth Avenue
                                        New York, New York  10017
                                        (212) 593-1100

## EXHIBIT B

## 553 WEST ASSETS AND LIABILITIES

Assets
Real property ...................................................................................... $5,500,000

Liabilities
Real Property Tax, Water & Sewer................................................. 44,240
First Mortgage.................................................................................. $2,475,000
General Unsecured Claims............................................................. $1,182,630
Total                                                                                              $3,701,870

## 553 WEST CHAPTER 7 LIQUIDATION ANALYSIS

Assets
Real Property.................................................................................... $5,550,000

Liabilities
First Mortgage.................................................................................. $2,475,000

Administration Claims...................................................................... $   550,000
General Unsecured Claims............................................................. $1,182,630
Equity................................................................................................ $1,292,370
Total                                                                                              $5,500,000

Note: Claims subject to objection, and joint and several liability exists on General Unsecured Claims

## SE ASSETS AND LIABILITIES

<u>Assets</u>
Personal Property ............................................................................ <u>$3,267,000</u>

<u>Liabilities</u>
General Unsecured Claims............................................................... <u>$ 1,409,000</u>

## SE CHAPTER 7 LIQUIDATION ANALYSIS

<u>Assets</u>
Perosnal Property .......................................................................... $3,267,000

<u>Liabilities</u>
Administration Claims.............................................................. $   326,000
General Unsecured Claims......................................................... $ 1,409,000
Equity........................................................................................ <u>$ 1,532,000</u>
Total                                                                                        $ 3,267,000